[Civ. No. 25446.   First Dist., Div. One.   Aug. 27, 1968.]

JACK CRAEMER et al., Petitioners, v. THE SUPERIOR COURT OF MARIN COUNTY, Respondent; JAN DE BRUYN, Real Party in Interest.

Freitas, Allen, McCarthy & Bettini, Freitas, Allen, Mc-Carthy, Bettini & MacMahon and Edgar B. Washburn for Petitioners.

Douglas J. Maloney, County Counsel, for Respondent.

Carl B. Shapiro for Real Party in Interest.

Marshall W. Krause, Paul N. Halvonik and Theodore C. Lachelt as Amici Curiae on behalf of Real Party in Interest.

MOLINARI, P. J.—Petitioners, Stephen Cook (a reporter for the newspaper "Independent-Journal"), Jack Craemer (editor of the "Independent-Journal") and California Newspapers, Inc. (owner and publisher of the "Independent-Journal"), seek this writ of mandate to compel respondent

superior court to vacate its order prohibiting the inspection of the transcripts of the testimony of witnesses at grand jury proceedings.[1]

The Grand Jury of Marin County returned indictments against 16 named defendants, all of whom were thereafter arrested and taken into custody. At the time the indictments were returned and necessarily before the preparation and filing of the reporter's transcripts of the proceedings before the grand jury, Judge Wilson, the judge receiving the indictments, ordered that ". . . the indictments remain sealed until each defendant is taken into custody, that the original of Grand Jury Transcripts be delivered to the District Attorney and the copies in possession of the clerk remain sealed, a copy to any defendant who is arrested and appears. The District Attorney is ordered not to disclose the contents of the Grand Jury transcript to unauthorized personnel, specifically newspapers, and the Clerk is not to furnish a copy of the transcript to any person without authority of the Court."

After the transcripts were filed with the Marin County Clerk, petitioner Cook sought inspection. The clerk refused access to the transcripts, relying upon the order of the superior court. Cook then requested authorization from Judge Wilson to inspect the transcripts, but inspection was denied. At the same time Judge Wilson stated that he has plans to seal all future grand jury transcripts to eliminate pretrial publicity by the press in serious criminal cases.

Although petitioners recognize that the trial court, based upon Penal Code section 938.1, had the power to restrict an inspection of the transcripts until the defendants were taken into custody,[2] petitioners challenge that portion of Judge Wilson's order which restricts inspection after the defendants are taken into custody. In that regard petitioners contend that they are entitled to inspect the transcripts because they are public records and that Judge Wilson's order abridges freedom of the press and denies a public trial. Respondent

[1] The petitioners have standing to challenge the superior court's order. Mandate lies to enforce inspection rights to public writings, even though the information sought by inspection is to be used in private business. (*Harrison* v. *Powers* (1912) 19 Cal.App. 762, 763 [127 P. 818]; *Smith* v. *Paul* (1959) 174 Cal.App.2d 744, 751 [345 P.2d 546, 77 A.L.R.2d 1036].)

[2] Penal Code section 938.1 provides, in relevant part, that after an indictment has been found "The county clerk shall not exhibit the transcript to any person other than the district attorney nor divulge any of its contents until after the defendant is in custody."

superior court contends that it has the power to take all measures which it deems reasonably necessary to insure that defendants charged with crime will receive fair trials without the taint of outside influence or extrajudicial statements, and that its order in the instant case did not abuse its discretion. Jan De Bruyn, one of the defendants who has appeared to oppose the petition, supports the contention of the respondent court. The American Civil Liberties Union of Northern California, as amicus curiae, takes the position that the trial court has inherent power to restrict a grand jury transcript, but asserts that this power must be based upon factual findings that the right to a fair trial will be impaired by an inspection of the transcript.

Adverting to these contentions we first point out that there is no issue in the present case with respect to the alleged denial of a public trial. Defendants have not yet been brought to trial and we find nothing in the record to indicate that the trial, or any of the court proceedings preliminary to the trial, or any of the sittings of the court in connection with the instant indictments, will not be open to the public and to petitioners, as members of the general public. (See U.S. Const., 6th Amend.; Cal. Const., art I, § 13; Pen. Code, § 686.) In this regard we point out that the right of petitioners to attend the trial does not devolve upon them as representatives of the press but as members of the general public. (See *Cembrook* v. *Sterling Drug Inc.*, 231 Cal.App.2d 52, 58-60 [41 Cal.Rptr. 492]; *Kirstowsky* v. *Superior Court*, 143 Cal.App.2d 745, 754-755 [300 P.2d 163].) We also note that the publication of a trial in the news media is not a necessary adjunct of the right to a public trial and that such right does not carry with it the concomitant right that the trial be publicized in the news media. (*Cembrook* v. *Sterling Drug Inc., supra*, at pp. 59-60.)

Turning our attention to the issue of free press, we perceive that it is only indirectly and collaterally involved in this case. The key issue here is whether access to and inspection of public records may be withheld in order to insure that a defendant in a criminal action will receive a fair trial, a right which is guaranteed by the United States and California Constitutions. (See *Estes* v. *Texas*, 381 U.S. 532, 539-540 [14 L.Ed.2d 543, 548-549, 85 S.Ct. 1628]; *Rochin* v. *California*, 342 U.S. 165, 169 [96 L.Ed. 183, 188, 72 S.Ct. 205, 25 A.L.R.2d 1396]; *Lisenba* v. *California*, 314 U.S. 219, 236 [86 L.Ed. 166, 179, 62 S.Ct. 280].) In *Estes* the Supreme Court

emphatically stated: "We have always held that the atmosphere essential to the preservation of a fair trial—the most fundamental of all freedoms—must be maintained at all costs." (P. 540 [14 L.Ed.2d p. 549].)

■ In this state the terms "public records" and "public writings" are used synonymously. (See *Hibernia Sav. & Loan Soc.* v. *Boyd,* 155 Cal. 193, 200 [100 P. 239]; *People* v. *Howard,* 72 Cal.App. 561, 563-564 [237 P. 780].) ■ A "public writing," insofar as here pertinent, is defined in Code of Civil Procedure section 1888 as "The written acts or records of the acts of the sovereign authority, of official bodies and tribunals, and of public officers, legislative, judicial, and executive, . . ." Public writings, in turn, are classified by Code of Civil Procedure section 1894 as "1. Laws; 2. Judicial records; 3. Other official documents; 4. Public records, kept in this State, of private writings." It is clear that within the meaning of the foregoing statutes the transcripts filed with the county clerk after the return of the indictments by the grand jury are "public writings." (See *Walker* v. *Superior. Court,* 155 Cal.App.2d 134, 138-139 [317 P.2d 130].)

In California the right to inspect public writings has been codified in two statutes.[3] (*Bruce* v. *Gregory,* 65 Cal.2d 666, 673 [56 Cal.Rptr. 265, 423 P.2d 193].) Section 1227 of the Government Code reads: "The public records and other matters in the office of any officer, *except as otherwise provided,* are at all times during office hours open to inspection of any citizen of the State." (Italics added.) Code of Civil Procedure section 1892 provides: "Every citizen has a right to inspect and take a copy of any public writing of this State, *except as otherwise expressly provided by statute.*" (Italics added.) As indicated by the provisions of these statutes the Legislature is empowered to provide for statutory exemptions. Accordingly, the right of a citizen to inspect public writings has been restricted by statute in a variety of situations some of which are set out in the footnote.[4]

---

[3]The right of a citizen to inspect public writings has its origin in the common law. In *State* v. *McGrath,* 104 Mont. 490 [67 P.2d 838, 841], the common law rule is stated thusly: "At common law every person was entitled to the inspection, either personally or by his agent, of public records, including legislative, executive, and judicial records, provided he had an interest therein such as to enable him to maintain or defend an action for which the documents or records sought could furnish evidence or necessary information." (See also *North* v. *Foley,* 238 App.Div. 731 [265 N.Y.S. 780]; *Palacios* v. *Corbett* (Tex. Civ. App.) 172 S.W. 777, 781; 76 C.J.S., Records, § 35, p. 133; 45 Am.Jur., pp. 426-427.)

[4]Some of the statutory exceptions are the following:

(a) Corporations Code section 25314, authorizing the Corporation Com-

To the many statutory exceptions the courts have added other exceptions which apply to situations not covered by statute. (See *Runyon* v. *Board etc. of Cal.*, 26 Cal.App.2d 183, 185 [79 P.2d 101] [letters and documents in possession of parole board]; *Chronicle Publishing Co.* v. *Superior Court*, 54 Cal.2d 548, 569 [7 Cal.Rptr. 109, 354 P.2d 637] [State Bar records in disciplinary proceedings]; *City & County of San Francisco* v. *Superior Court*, 38 Cal.2d 156, 161-162 [238 P.2d 581] [communication in official confidence]; *City Council* v. *Superior Court*, 204 Cal.App.2d 68, 75 [21 Cal.Rptr. 896] [communication in official confidence]; *Smith* v. *Paul*, 174 Cal.App.2d 744, 751-752 [345 P.2d 546, 77 A.L.R.2d 1036] [architect's plans]; *Markwell* v. *Sykes*, 173 Cal.App.2d 642, 647-648 [343 P.2d 769] [communication in official confidence]; *Jessup* v. *Superior Court*, 151 Cal.App.2d 102, 108 [311 P.2d 177] [communication in official confidence]; *People* v. *Wilkins*, 135 Cal.App.2d 371, 377 [287 P.2d 555] [confidential records of police department]; *People* v. *Pearson*, 111 Cal.App.2d 9, 18 [244 P.2d 35] [confidential records of sheriff's office].)

In *Runyon, supra,* the applicable rule is stated thusly: "[T]he courts have consistently declared that in another class

missioner to "withhold from public inspection for such time as in his judgment is necessary any information which . . . the public welfare or the welfare of [interested parties] requires to be so withheld."

(b) Vehicle Code sections 1808, 20012, providing that records of mental and physical condition of license applicants, and accident reports, are confidential.

(c) Public Resources Code section 2207, holding confidential reports of mining operators to the State Mineralogist.

(d) Code of Civil Procedure section 537.5, which requires the clerk of the court in a case of attachment to "not make public the fact of the filing of the complaint, or of the issuance of the attachment, until after the filing of the return of service of the writ of attachment."

(e) Civil Code section 227, providing that papers in adoption proceedings shall not be open for inspection by other than certain designated parties.

(f) Penal Code section 1203.10, allowing records of the probation officer to be open for inspection only by designated persons.

(g) Welfare and Institutions Code section 827, limiting the persons who may inspect certain juvenile court records.

(h) Revenue and Taxation Code section 19282, making it a misdemeanor for Franchise Tax Board employees to disclose certain tax information.

(i) Penal Code section 925, providing that the county clerk shall not exhibit a grand jury transcript to any person other than the district attorney nor divulge any of the contents thereof until after the defendant is in custody.

(j) Evidence Code section 1040, creating a privilege in a public entity to refuse to disclose official information under certain conditions.

(k) Penal Code section 1203.45, providing for the sealing of criminal records from the public in certain cases.

of cases public policy demands that certain communications and documents shall be treated as confidential and therefore are not open to indiscriminate inspection, notwithstanding that they are in the custody of a public officer or board and are of a public nature. [Citation.] Included in this class are documents and records kept on file in public institutions, concerning the condition, care and treatment of the inmates thereof, and the files in the offices of those charged with the execution of the laws relating to the apprehension, prosecution and punishment of criminals. [Citation.]'' (26 Cal.App. 2d at pp. 184-185.)

In *Bruce, supra,* the California Supreme Court, while recognizing that it is the policy of this state that public records and documents be kept open for public inspection in order to prevent secrecy in public affairs (p. 677), held, nevertheless, ''that the rights created by section 1892 of the Code of Civil Procedure and section 1227 of the Government Code, are, by their very nature, not absolute, but are subject to an implied rule of reason.'' (65 Cal.2d at p. 676.)

■ In the light of the foregoing we apprehend that the applicable rule may be stated thusly: where there is no contrary statute or countervailing public policy, the right to inspect public records must be freely allowed. In this regard the term ''public policy'' means anything which tends to undermine that sense of security for individual rights, whether of personal liberty or private property, which any citizen ought to feel has a tendency to be injurious to the public or the public good. (*Safeway Stores, Inc.* v. *Retail Clerks etc. Assn.,* 41 Cal.2d 567, 575 [261 P.2d 721]; *Petermann* v. *International Brotherhood of Teamsters,* 174 Cal.App.2d 184, 188 [344 P.2d 25].) The public policy of a state is found in its constitution, acts of the Legislature, and decisions of its courts. (*Safeway Stores, Inc.* v. *Retail Clerks etc. Assn., supra; Petermann* v. *International Brotherhood of Teamsters, supra.*) By the same token, where the federal Constitution and the decisions of the United States Supreme Court are made applicable to the states, the public policy there embodied becomes that of the states. (See *Mapp* v. *Ohio,* 367 U.S. 643, 655-660 [6 L.Ed.2d 1081, 1089-1093, 81 S.Ct. 1684, 84 A.L.R.2d 933]; *Gideon* v. *Wainwright,* 372 U.S. 335, 342 [9 L.Ed.2d 799, 803, 83 S.Ct. 792, 93 A.L.R.2d 733]; *Malloy* v. *Hogan,* 378 U.S. 1, 6 [12 L.Ed.2d 653, 658, 84 S.Ct. 1489]; *Griffin* v. *California,* 380 U.S. 609, 613, 615 [14 L.Ed.2d 106, 109, 110, 85 S.Ct. 1229].) Accordingly, the due process re-

quirements in both the Fifth and Fourteenth Amendments and the provisions of the Sixth Amendment requiring a procedure that will assure a fair trial are applicable to the states. (*Gideon* v. *Wainwright, supra;* *Malloy* v. *Hogan, supra;* *Griffin* v. *California, supra;* *Estes* v. *Texas, supra;* *Sheppard* v. *Maxwell,* 384 U.S. 333, 358-363 [16 L.Ed.2d 600, 617-620, 86 S.Ct. 1507].)

In the case before us there is no statutory provision restricting the inspection of the grand jury transcripts after the indictment and apprehension of the defendants. Therefore, the actions of the grand jury and the record of its proceedings should not be unnecessarily, and without reason, withheld from public scrutiny after the indictment and apprehension of the defendants unless a countervailing public policy requires such a restriction. In the instant case it is apparent that the court's order restricting inspection of the transcripts is based on the judicial power to control criminal proceedings and related publicity to assure each defendant a fair trial. Our immediate inquiry, therefore, is whether, in the light of the principles discussed, the court below was justified in making such an order; and, if so, whether it was empowered to remove the record from public inspection indefinitely and without limitation.

In *Estes* v. *Texas, supra,* 381 U.S. 532, it was held that excessive prejudicial publicity can render a defendant's trial unfair, in violation of the due process clause. (Pp. 538, 542-544, 550-551 [14 L.Ed.2d pp. 547, 549-551, 554-555].) The effect of such publicity upon the fundamental right to a fair trial and the power to control it were discussed in *Sheppard* v. *Maxwell, supra,* 384 U.S. 333. Although the Supreme Court did not consider what sanctions might be available against a recalcitrant press for the dissemination of prejudicial publicity, it did hold that there were other means available to a court which it could utilize to reduce the appearance of prejudicial material and to protect from outside influences the jury which would be called up to try the case. These measures include (1) controls on the use of the courtroom and the courthouse by the press; (2) insulation of the witnesses from the press; (3) controls over the release of leads, information, and gossip to the press by police officers, witnesses, and the counsel for both sides; the proscription of extrajudicial statements by any lawyer, party, witness, or court official which divulge prejudicial matters; and requests that the appropriate city and county officials promulgate a regulation with respect

to dissemination of information about the case by their employees; (4) warnings to the press of the impropriety of publishing prejudicial material; (5) continuing the case until the threat to a fair trial because of prejudicial news abates, or changing the venue to another jurisdiction not so permeated with publicity; and (6) sequestration of the jury. (Pp. 358-363 [16 L.Ed.2d pp. 617-620].)

Although in *Sheppard, supra,* the United States Supreme Court specifically stated that it could not say that the petitioner was denied due process because of the judge's refusal to take precautions against the influence of pretrial publicity alone (p. 354 [16 L.Ed.2d p. 615]), it is clear that the measures delineated apply to pretrial publicity as well as to publicity during the trial. Significant is the following statement: "The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures." (P. 363 [16 L.Ed.2d p. 620].)

In the light of the foregoing, the principle we distill from the *Sheppard* case is that a court can, and should protect its processes from prejudicial outside interferences by the promulgation of rules and regulations controlling the use of property and the conduct of persons under the court's jurisdiction. It should be noted, however, that the Supreme Court did not purport to prescribe rules or measures directly regulating the conduct or activity of the news media or other persons not under the jurisdiction of the court, except insofar as such conduct or activity is indirectly limited and restricted by the controls and limitations placed upon the property and persons under the court's jurisdiction. With respect to the news media, the Supreme Court recognized that a responsible press assists effective judicial administration because it "guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism," and that, therefore, the court was unwilling to place and direct limitations on the freedoms traditionally exercised by the news media. (P. 350 [16 L.Ed.2d p. 613].) This attitude was apparently a reiteration of the

court's previous acknowledgment in *Bridges* v. *California,* 314 U.S. 252 [86 L.Ed. 192, 62 S.Ct. 190, 159 A.L.R. 1346] that "free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them." (P. 260 [86 L.Ed. p. 201].) Accordingly, with respect to the salutary objective of obviating and preventing unfair and prejudicial news comment on pending trials, the Supreme Court, in *Sheppard,* was satisfied that the news media was responsible and capable of self-discipline. The caveat was stated, however, that the impropriety of publishing unfair and prejudicial news could, as in the *Sheppard* case, result in a reversal and a new trial.

Adverting to the instant case, we note that Judge Wilson was apparently acting within the frame of reference outlined in *Sheppard.* He did not purport to directly limit or restrict the news media in its dissemination of publicity concerning the instant case, but merely purported to limit and restrict the conduct of the prosecutor and the county clerk, who, as officers of the court, come under its jurisdiction. Accordingly, the court's action sought to reduce the appearance of prejudicial material by removing, through its directive, a public record from the inspection of the public.

In the light of *Estes* and *Sheppard, supra,* it is clear that a judge has the duty to protect a defendant from inherently prejudicial publicity. Accordingly, it follows that in the performance of that duty a judge may require the removal from public scrutiny of a public record containing data or material which, if publicized prior to trial, could result in publicity so inherently prejudicial as to endanger a fair trial. In the instant case it is clear that Judge Wilson's order was not based upon evidence establishing a reasonable likelihood that inherently prejudicial publicity will saturate the community and thus endanger defendants' right to a fair trial, but that it is predicated upon an awareness of the probability that prejudice to defendants will result.

In *In re Murchison,* 349 U.S. 133, 136 [99 L.Ed. 942, 946, 75 S.Ct. 623] it is stated that ". . . our system of law has always endeavored to prevent even the probability of unfairness." (See also *Estes* v. *Texas, supra,* at pp. 542-543 [14 L.Ed.2d at pp. 549-550]; *Sheppard* v. *Maxwell, supra,* at p. 352 [16 L.Ed.2d at p. 614].) In *Sheppard, supra,* the Supreme Court noted that in applying the rule of the probability of prejudice, "appellate tribunals have the duty to make an independent evaluation of the circumstances." (P.

362 [16 L.Ed.2d p. 620].) Accordingly, we think that in keeping with a trial judge's duty to insure that a defendant will receive a fair trial the judge may, in order to prevent even the probability of unfairness, make such orders as are reasonably designed to avert improper prejudice to indicted defendants.

Judicial experience has shown that pretrial publication of grand jury proceedings has had a tendency, in some instances, to prejudice a defendant's right to a fair trial. Such transcripts often contain criminal records, alleged confessions, and other matter which is later ruled out as evidence in the trial. That such information should be kept from the eyes and ears of prospective jurors is undeniably in the interest of justice. Furthermore, it is clearly against public policy for a prosecutor to give pretrial circulation to questionable evidence of confessions, admissions, or results of searches and seizures, and to give pretrial publicity to a defendant's criminal record. Indeed, an official so doing would be subject to censure and even contempt sanctions. It is tenuous, moreover, to assume that such a practice becomes public policy by the mere act of presenting such matter to a grand jury and thus causing its inclusion in the grand jury transcript.

Remaining for our consideration is the question of whether the lower court's order is reasonable and not unnecessarily broad in its application. The effect of the order is to permanently deny the right of public inspection of the grand jury records in question. We think that such an order is unreasonable since the only justifiable purpose of the order is to prevent public knowledge of inadmissible matter prior to the completion of the defendant's trial. To extend the order beyond this justifiable purpose in the present case does violence to the general policy of this state that public records and documents be kept open for public inspection in order to prevent secrecy in public affairs. As noted in *Estes, supra,* "History has proven that secret tribunals were effective instruments of oppression" (p. 539 [14 L.Ed.2d p. 548]) ; and, as noted in *Sheppard, supra,* "justice cannot survive behind walls of silence." (P. 349 [16 L.Ed.2d p. 613].)

Judge Wilson's indicated purpose in the present case can be accomplished by affording an indicted defendant a reasonable opportunity to examine the grand jury transcript for objectional matter, and, if such is found, to move the court that such matter be held from public scrutiny until after trial of the case. Such a procedure appears to be a reasonable accommodation of the right to inspect public records

to the constitutional right of an indicted defendant to a fair trial. Moreover, it makes certain that in due course records of grand jury proceedings will become public information.

In our opinion a proper order can require that grand jury transcripts not be disclosed to any person (other than those specifically mentioned in Penal Code section 938.1) until a specified reasonable period of time after a copy thereof has been delivered to the defendant; provided that if the defendant, during such time, shall move the court that such transcript, or any portion thereof, not be available for public inspection pending trial, such time shall be extended subject to the court's ruling on such motion. With regard to multiple or unapprehended defendants, we recognize that problems will occasionally occur. These situations must be met as public policy and the justice of each case require.

It is suggested that the order we deem proper is too broad in the sense that it applies to all grand jury transcripts, and that each case should, on defendant's motion, be individually considered by the judge, who, if good cause exists, could then make an appropriate order. This argument ignores the realities of our practice. Often transcripts are prepared and made available to the public before the defendant is arraigned or has any knowledge of the transcript's content. The right of a defendant to a fair trial should not be left to the chance that he will have had an opportunity to secure a court order suppressing public inspection of a grand jury transcript.

The peremptory writ is granted as prayed for without prejudice to the making by the trial court of an order according to the view herein expressed.

Sims, J., and Elkington, J., concurred.